# PLAINTIFF'S REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**BILLY STEFFEY,**
Plaintiff, in pro per
455 Capitol Mall 8ᵗʰ Fl

Sacramento, CA 95814

C/O Reichel Law

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

```
FILED
CLERK, U.S. DISTRICT COURT

12/8/2025

CENTRAL DISTRICT OF CALIFORNIA
BY:____clee____DEPUTY
```

---

**BILLY STEFFEY,**
Plaintiff,

v.

**COLETTE PETERS, et al.,**
Defendants.

Case No. LA CV 25-11105-VBF (SK)

**PLAINTIFF'S REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Date: 12/09/2025
Judge: Hon. Valerie Baker Fairbank

---

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................ 1
II. ONGOING CONCRETE HARM: STANDING AND MOOTNESS ............. 3
    A. Employment and economic harm ................................................ 3
    B. Family-court use of the "drug trafficker" narrative ...................... 4
III. FRAUD ON THE COURT AND LIMITS OF § 2241 PRECLUSION ............ 5
    A. Concealment of the "One Team" directive .................................. 5
    B. Misrepresentation of the NIK Test U "burgundy" result .............. 6

C. Heck and the Nonnette exception ................................................ 7

IV. SCIENTIFIC FRAMEWORK: TEST A / TEST U / TEST W, BASELINE COLORS, AND MICHEL ................................................ 8

    A. Test A (Marquis) and paper false positives .................................. 8

    B. Test U (Simons / sodium nitroprusside) – burgundy is negative ... 9

    C. Test W – baseline yellow-brown / aging to olive green ............... 11

    D. Michel v. United States: DEA chemist and field test limits ........... 12

V. ONGOING NATIONWIDE PRACTICE AND TOLLING: 2024–2025 § 2241 CASES .................................................... 14

VI. SAFARILAND'S ROLE IN THE SCHEME ........................................... 18

VII. LEGALITY AND SCOPE OF REQUESTED TRO RELIEF ..................... 21

    A. TRO standard and PLRA narrowness ........................................ 21

    B. Why Plaintiff's requested TRO is legally proper and does **not** require a class action ........................................ 22

VIII. REQUESTED TRO TERMS (EVIDENCE PRESERVATION, ESI, AND PROTECTIVE ORDER) ...................................................... 24

IX. CONCLUSION ........................................................................... 27

---

## TABLE OF AUTHORITIES

**Cases**

Berkovitz v. United States, 486 U.S. 531 (1988) ................................... 21

Burnsworth v. Gunderson, 179 F.3d 771 (9th Cir. 1999) ........................ 10

Chaker v. Crogan, 428 F.3d 1215 (9th Cir. 2005) ................................. 4

Devereaux v. Abbey, 263 F.3d 1070 (9th Cir. 2001) .............................. 10

Egbert v. Boule, 142 S. Ct. 1793 (2022) ............................................... 22

Heard v. Sheahan, 253 F.3d 316 (7th Cir. 2001) ................................... 16

Heck v. Humphrey, 512 U.S. 477 (1994) .............................................. 7

Lukovsky v. City & Cnty. of S.F., 535 F.3d 1044 (9th Cir. 2008) ............ 16

Michel v. United States, No. 3:16-cv-00277, 2019 WL 6134949 (S.D. Cal. Nov. 19, 2019) ....................................................... 12

Millbrook v. United States, 569 U.S. 50 (2013) .................................... 22

Nonnette v. Small, 316 F.3d 872 (9th Cir. 2002) ................................... 7

Paul v. Davis, 424 U.S. 693 (1976) ...................................................... 4

Superintendent v. Hill, 472 U.S. 445 (1985) .................................. 6, 19

Wolff v. McDonnell, 418 U.S. 539 (1974) .............................................. 6

Winter v. NRDC, 555 U.S. 7 (2008) ..................................................... 21

**Recent § 2241 decisions (illustrative)**

Fuller v. Rich, No. 5:24-HC-02100-M-RJ (E.D.N.C. Jan. 27, 2025) ....... 15

Mahasin v. Warden, USP Atwater, No. 1:25-cv-00363 (E.D. Cal. F&Rs Oct. 3, 2025) ........................................................... 15

**Statutes and Rules**

18 U.S.C. § 3626 ................................................................... 21
28 U.S.C. § 1331 ..................................................................... 5
28 U.S.C. § 1346(b) ............................................................. 21
28 U.S.C. § 2241 ..................................................................... 5
28 U.S.C. § 2680(h) ............................................................. 21
Fed. R. Civ. P. 65 ............................................................... 21
Fed. R. Evid. 408 ................................................................ 18

# PLAINTIFF'S REPLY IN SUPPORT OF EMERGENCY MOTION FOR TRO AND PRELIMINARY INJUNCTION

## I. INTRODUCTION

Defendants treat this case as if it were a stale challenge to a 2018 disciplinary hearing. It is not. This Reply addresses an **ongoing, nationwide scheme** in which the Bureau of Prisons ("BOP"), using guidance developed with Safariland LLC, continues to:

1. Use NIK Test U (Simons Reagent/sodium nitroprusside) on paper substrates and
2. Intentionally misrepresent the **baseline burgundy color** of Test U as a "positive" for amphetamines

— while federal courts are told, in § 2241 proceedings, that these results are valid drug positives and therefore satisfy *Superintendent v. Hill*'s "some evidence" standard.

This is not theory. As late as **October 2025**, the Eastern District of California relied on a DHO report stating that NIK Test A "turned orange to brown," Test U "turned burgundy," and Test W "turned to green," and that this sequence "confirm[ed] positive test for Amphetamine," to deny habeas relief and uphold the disallowance of good-conduct time and SHU confinement. Similarly, in **January 2025**, the Eastern District of North Carolina accepted BOP representations that a NIK A/U/W sequence—where Test U turned "burgundy" and Test W turned "olive"— proved a positive amphetamine result and upheld the loss of 41 days of good-conduct time, 20 days in SHU, and six months' commissary loss.

In both cases, BOP told the courts exactly what it told the habeas court in Plaintiff's prior § 2241: that **burgundy on Test U equals "positive for amphetamines."** Chemically, that is false.

The urgency is heightened by Defendants' own behavior. Within **four hours** of this Court's order requiring Safariland to respond, Safariland's counsel, Ms. Sydney Schaffer, called Plaintiff

at approximately 8:30 pm; two days later she left a voicemail stating she intended to move to dismiss **but also** asking for a **settlement demand**. Plaintiff declined to name a number and responded in writing that "Safariland was deeply ingrained in this case and will continue to be." This rapid, two-track response—threatening dismissal while simultaneously seeking to buy peace before discovery—speaks volumes about Safariland's assessment of the risk.

Meanwhile, Plaintiff continues to suffer concrete harms: loss of a well-paid tech job when a coworker found the § 2241 decision describing him as an attempted drug introducer, and the use of that same record to attack him in Sacramento family court as a "drug trafficker." This is not past; it is present.

Plaintiff's TRO request is narrow: a **preservation order and non-retaliation order** directed at BOP, DOJ, and Safariland, to ensure that emails, SIS advisories, training materials, and electronic evidence from 2015–present are not destroyed or altered while this case proceeds, and to protect Plaintiff and any cooperating inmates or staff from retaliation. Broader, system-wide remedies (such as ceasing the use of NIK tests as stand-alone "some evidence") can be addressed at the preliminary-injunction or merits stage under the Prison Litigation Reform Act ("PLRA").

The record—scientific, documentary, and judicial—now shows:

- The **only** positive color for methamphetamine/secondary amines in Test U is **blue**, and a **burgundy** color is the reagent's baseline negative state;
- Test W's baseline color is **yellow-brown**, and as the reagent ages past its 6–12 month shelf life, the baseline shifts toward **olive green**, approximating the very color BOP now labels "positive";
- BOP and AUSAs have repeatedly told federal courts that burgundy Test U results are "positive for amphetamines," leading courts to deny § 2241 relief and uphold the loss of good conduct time and SHU confinement as recently as 2025;
- Safariland's own field-test litigation (*Michel v. United States* **Citation:** No. 3:16-cv-00277-GPC-AGS, 2017 WL 4923337 (S.D. Cal. Oct. 31, 2017) confirms that sodium nitroprusside reagents produce **blue** for positive and **burgundy/purple** when no secondary amine is present.

A TRO is necessary precisely because these same actors, who have repeatedly misled courts about chemistry, now control the emails, training files, SIS advisories, and test data that will either prove or disprove a systemic conspiracy. If they are willing to misrepresent science to secure disciplinary convictions and defeat habeas petitions, it is not speculative to fear deletion or alteration of incriminating ESI.

## II. ONGOING CONCRETE HARM: STANDING AND MOOTNESS

**A. Employment and economic harm**

Defendants suggest that Plaintiff's release moots this case. Not so. Plaintiff's injury is the classic **stigma-plus** recognized in *Paul v. Davis*, 424 U.S. 693 (1976).

- Plaintiff obtained a high-value position at a technology company after his release.
- Approximately six months into employment, a coworker Googled Plaintiff's name, found the § 2241 habeas decision describing him—based on BOP's mischaracterizations—as an inmate who attempted to introduce drugs into a federal prison, and reported this to HR.
- Plaintiff has never been arrested or charged with any narcotics offense. The sole basis for the "drug trafficker" stigma is the falsified NIK test and resulting Code 111 conviction.
- Plaintiff was terminated.

This is not a hypothetical reputational concern; it is a **real, documented loss of employment and income** that flows directly from the challenged disciplinary finding and the underlying fraud.

### B. Family-court use of the "drug trafficker" narrative

Three months ago, in **Sacramento Family Court**, the father of Plaintiff's girlfriend's children introduced the government's § 2241 response and related documents to argue that Plaintiff was a "drug trafficker" and unsafe to be around the children. The state court declined to impose the requested restriction, but the very fact that federal filings based on a chemically impossible "positive" are being used to attack Plaintiff's family relationships demonstrates a continuing, concrete impairment of his liberty interests.

These injuries are:

- **Concrete and particularized** (job loss; family-court prejudice);
- **Fairly traceable** to Defendants' misrepresentation of NIK results and the "One Team" directive; and
- **Redressable** through correction/expungement of the disciplinary record and declaratory relief.

Accordingly, there is no mootness problem; the collateral-consequences doctrine and basic Article III principles are satisfied.

## III. FRAUD ON THE COURT AND LIMITS OF § 2241 PRECLUSION

### A. Concealment of the "One Team" directive

In Plaintiff's prior § 2241, BOP and the AUSA assured the court that DHO Chetwood was impartial and that no improper ex parte coordination occurred. Plaintiff now possesses the January 2017 and January 23, 2018 communications from Western Region SIA R. John Lynn and other executives explicitly telling SIS and DHOs that:

- "we are all on one team"; and
- the goal is to "hold inmates accountable," not to serve as neutral adjudicators.

These directives created a culture in which investigators and DHOs coordinated outcomes in advance and treated hearings as formalities. The fact that this policy was not provided to the habeas court is critical. A judgment procured by **concealment of such a directive** is not entitled to preclusive deference in a later civil action seeking to uncover that same concealed misconduct.

## B. Misrepresentation of the NIK Test U "burgundy" result

The § 2241 court was also misled about the chemistry. What the DHO and SIS actually observed in Plaintiff's case was:

- NIK Test A (Marquis) on legal-mail paper: orange to brown
- NIK Test U (Simons): **burgundy**

Those who designed the NIK system know—and testified in other litigation—that sodium nitroprusside (Simons) turns **blue** in the presence of methamphetamine and other secondary amines, but remains burgundy/purple where no such secondary amine is present. Nonetheless, in Plaintiff's § 2241, the BOP and AUSA represented to the court that Test U was "positive for amphetamines" and that this satisfied *Hill*'s "some evidence" standard.

That is not merely weak evidence; it is **fabricated evidence**. A chemically negative reaction was re-labeled "positive" and presented as scientific fact to a federal judge. *Hill* presupposes some indicia of reliability; it does not license the government to invert basic chemistry.

A judgment resting on false scientific assertions and concealed policies is, at most, a product of **fraud on the court**, not a bar to truth-seeking in this FTCA and constitutional action.

## C. Heck and the Nonnette exception

Defendants invoke *Heck v. Humphrey* to argue that Plaintiff may not challenge the disciplinary conviction unless it is first invalidated on habeas. But under *Nonnette v. Small*, 316 F.3d 872 (9th Cir. 2002):

- A former prisoner who diligently sought habeas relief while in custody;
- Who is now released and cannot pursue habeas; and
- Who would otherwise have **no forum** to challenge the constitutional violations

is not barred by *Heck*.

Plaintiff filed a § 2241, litigated it, lost on a record tainted by misrepresentation and concealment, and was later released. He cannot go back to habeas. To apply *Heck* here would convert BOP's fraud on the habeas court into a permanent shield. *Nonnette* does not allow that result.

Moreover, the TRO seeks **equitable** relief (preservation, non-retaliation), not immediate restoration of credits. The relief requested does not itself "necessarily imply" invalidity of the conviction; it preserves the ability to prove that invalidity later.

---

## IV. SCIENTIFIC FRAMEWORK: TEST A / TEST U / TEST W, BASELINE COLORS, AND MICHEL

### A. Test A (Marquis) and paper false positives

NIK "Test A" is a Marquis reagent: a concentrated acid (sulfuric acid) and formaldehyde mix originally validated for crystalline drugs and tablets, **not** legal documents. When applied to paper:

- Sulfuric acid dehydrates and chars cellulose and starch sizing, producing a brown/black color;
- This charring can mimic the "orange to brown" transition Safariland's charts associate with amphetamines.

Safariland's own materials warn against testing paper substrates for precisely this reason. Using Marquis on legal mail to generate "some evidence" is thus a designed false-positive mechanism.

### B. Test U (Simons / sodium nitroprusside) – burgundy is negative

NIK Test U uses **Simons' reagent** (sodium nitroprusside, acetaldehyde, and base) to differentiate between primary and secondary amines. The chemistry is straightforward:

- In the presence of a **secondary amine** (methamphetamine, MDMA, etc.), the reagent produces a **dark blue** complex.
- If there is **no secondary amine**, the mix remains its inherent burgundy/purple color.

In Michel-type litigation, a DEA chemist explained that when using sodium nitroprusside field kits, "if [the] chemical reaction produces a blue color change, then there is [a] secondary amine and if there is no secondary amine, then the color change is burgundy." Michel concerned a "NarcoPouch 923" device, but the underlying chemistry is the same: sodium nitroprusside + acetaldehyde + base.

Thus:

- **Blue** = positive for secondary amine (e.g., methamphetamine);
- **Burgundy/purple** = **negative** for secondary amines, or no reaction.

In the recent § 2241 decisions cited below, BOP repeatedly told courts that:

Test U "shifted to burgundy color… confirming positive test for Amphetamine."

That sentence is chemically nonsensical. A burgundy Test U result cannot "confirm positive" for methamphetamine or any secondary amphetamine analogue. It is the **baseline negative** state of the reagent.

The fraud is therefore not subtle:

- The reagent's **default negative color** (burgundy) is being called "positive";
- Courts accept this representation and apply *Hill*;
- Inmates lose good-conduct time and are placed in SHU on the strength of a color that **means the opposite** of what BOP claims.

### C. Test W – baseline yellow-brown, aging to olive green

NIK Test W is an older opioid-oriented kit, validated decades ago for certain opiates. It is not designed for synthetic cannabinoids (K2/Spice) or buprenorphine, yet BOP's "A–U–W" sequence is now being used as a purported multi-step confirmation of "designer drugs" and Suboxone.

Key points:

- Test W's **baseline color** when fresh is **yellow to yellow-brown**.
- The reagent has a **6–12 month shelf life** under ideal storage; as it ages and the acids oxidize, the baseline solution itself begins to darken toward an **olive green** tone.
- A true positive is supposed to involve a distinct color change (e.g., to purple or dark blue), not the reagent slowly darkening as it expires.

Recent § 2241 decisions show BOP seizing on that aging baseline:

- In *Fuller v. Rich*, staff reported that Test W turned "olive in color," and this was described to the court as "positive for amphetamines," in conjunction with Test A orange/tan and Test U burgundy results.
- In *Mahasin v. Warden, USP Atwater*, Lieutenant Langley wrote that Test A turned brown, Test U shifted to burgundy, and Test W "turned to green in color confirming positive test for Amphetamine," and the DHO accepted this as conclusive.

In other words, **baseline** or **aging** colors for Test W are now being sold to federal courts as proof of contraband. Combined with the inversion of Test U's burgundy baseline, this A/U/W "shell game" allows BOP to declare virtually any soaked paper a "positive" amphetamine result.

Critically, none of this changes the fact that:

- No arrangement of A, U, and W can convert these decades-old reagents into tests for K2/Spice or buprenorphine;
- Swapping K for W and claiming "A–U–W" is "validated" for designer synthetics is pure invention.

**D. Michel v. United States: DEA chemist and field test limits**

In **Michel v. United States**, a woman was held for months after a sodium-nitroprusside-based field test produced a "dark blue" result later disproven by laboratory gas chromatography/mass spectrometry (GC/MS). The Southern District of California ultimately granted summary judgment for Safariland on the particular product-liability theories asserted, but in doing so the court acknowledged:

- NarcoPouch 923 is a **presumptive** test only;
- Field tests must be **confirmed** by certified laboratory analysis; and
- DEA chemist testimony established that the correct color for a positive secondary amine reaction is **blue**, whereas **burgundy/purple indicates no secondary amine is present**.

Michel thus underscores two crucial points:

1. **Chemistry** – the same sodium nitroprusside logic applies to NIK Test U: blue is positive; burgundy is the default negative.
2. **Confirmation** – Safariland trains and markets these as presumptive tools, not final determinants of guilt.

Here, BOP and Safariland know that in the prison context, nothing is sent to a lab for confirmation. Unlike street arrests, where prosecutors and courts demand GC/MS before sustaining charges, BOP uses the unconfirmed NIK result itself as "some evidence" and mislabels **negative** colors as "positive" to justify SHU placement and loss of good conduct time.

Safariland cannot have it both ways:

- Telling courts in Michel that their products are only presumptive and must be confirmed, thereby escaping liability; yet
- Remaining silent (or worse, providing "flow charts") while BOP uses those same presumptive kits as **final proof** of drugs in a closed prison system, where inmates cannot obtain independent lab tests.

---

## V. ONGOING NATIONWIDE PRACTICE AND TOLLING: 2024–2025 § 2241 CASES

The government will argue that anything that happened to Plaintiff in 2017–2018 is old, that any FTCA/Bivens claims are time-barred, and that any conspiracy has long since ended. The **record says otherwise**.

Recent § 2241 decisions show that the same **A–U–W burgundy scheme** continues today, and that federal courts are still being told that **burgundy on Test U equals a positive**.

**A. Mahasin v. Warden, USP Atwater (E.D. Cal. 2025)**

In *Mahasin v. Warden, USP Atwater*, the Eastern District of California denied habeas relief to an inmate who, like Plaintiff, was accused of using soaked legal mail to introduce drugs. The court summarized the DHO's reliance as follows:

"Staff then tested the content of the mail utilizing NIK tests A, U, and W in order. The first test turned orange to brown in color, the second test turned burgundy in color, and the third test turned to green in color confirming positive test for Amphetamine. Inmate Mahasin was then placed in the Special Housing Unit pending SIS investigation."

and:

Lieutenant Langley… indicated, "On October 31, 2022, at approximately 1 p.m., I tested an unidentified saturated sample… I utilized the IdentiDrug chart and tested the substance with the NIK test kit A, U, and W. A NIK test turned orange to brown color. U NIK test kit shifted to burgundy color. NIK test W, turned to green in color confirming positive test for Amphetamine."

The sanctions included (as summarized in the DHO report and findings):

- Loss of **41 days** of good-conduct time;
- **Disciplinary segregation** in SHU;
- Loss of telephone and email privileges.

The dispositive point is simple: in 2025, BOP and the AUSA told a federal court that **burgundy on Test U is "positive for amphetamine,"** and the court accepted this representation to find *Hill*'s "some evidence" standard satisfied and deny relief.

**B. Fuller v. Rich (E.D.N.C. 2025)**

Similarly, in *Fuller v. Rich*, No. 5:24-HC-02100-M-RJ (E.D.N.C. Jan. 27, 2025), an inmate challenged a Code 111 conviction. The BOP reported, and the court recounted, that:

NIK Test A produced an "orange to tan" color change, leading staff to continue testing with Test U. Test U then turned "burgundy," leading staff to proceed to Test W. Test W turned "olive in color," which staff interpreted as a positive for amphetamines.

On that basis, the DHO imposed:

- Disallowance of **41 days** of good-conduct time;
- **20 days** in SHU;
- **6 months** loss of commissary privileges.

Again, the pattern is identical: A/U/W, with **burgundy on Test U** treated as a confirming positive, and the court relying on BOP's interpretation to deny habeas relief and uphold the sanctions.

**C. Pattern and tolling**

These cases are not cherry-picked for positive results; they are chosen precisely because:

- The NIK sequence is **A–U–W**;
- Test U is expressly reported as **burgundy**;
- BOP explicitly treats that burgundy color as part of a "positive test for amphetamines"; and
- Federal courts accept that representation and deny § 2241 relief on *Hill* grounds.

Plaintiff found these cases in minutes. He is aware of dozens more § 2241 decisions over the past two decades in which BOP staff, and AUSAs speaking through their briefs, described burgundy Test U results as "positive for amphetamines" and courts relied on that assertion to deny relief. The precise content of those DHO reports and SIS memoranda—still on BOP servers—is the evidence this TRO is designed to preserve.

Under the **discovery rule** and **fraudulent-concealment** doctrine:

- Plaintiff could not reasonably have discovered, as an inmate in SHU, that burgundy was chemically negative and that Safariland's own materials contradicted BOP's narrative;
- BOP affirmatively concealed the SIS advisory, the "One Team" emails, and the true chemistry from inmates and the § 2241 court;
- The **conspiracy is ongoing**, as shown by Mahasin and Fuller; the last overt acts—misrepresenting burgundy and A/U/W to courts and imposing SHU and GCT loss—occurred within the last year.

Where a conspiracy involves continuing misrepresentations and ongoing injuries, the limitations period is tolled until the last overt act or until the fraud is discovered. *Heard v. Sheahan*, 253 F.3d 316 (7th Cir. 2001); *Lukovsky v. City & Cnty. of S.F.*, 535 F.3d 1044 (9th Cir. 2008). Here, both are recent.

Plaintiff does **not** ask the Court in this TRO to decide class-wide relief for all inmates affected by these practices. He relies on these recent cases for three purposes:

1. To show that his own experience is part of a **continuing pattern**, not an isolated past event;
2. To demonstrate that BOP and AUSAs are still making the same false representations to federal courts today; and
3. To justify **tolling** and the urgent need to preserve evidence before it can be destroyed or "lost."

---

## VI. SAFARILAND'S ROLE IN THE SCHEME

Safariland is not a passive bystander. The evidence (including its flow charts, training materials, and communications with BOP leadership) supports the following:

1. **Safariland knows** that Test U's only valid positive color is **blue** and that burgundy is a negative baseline.
2. Safariland's **own field-test litigation** (Michel) confirms that sodium nitroprusside tests are presumptive only and must be lab confirmed.
3. Safariland and BOP together developed an **A–U–W sequence** that appears nowhere in standard SWGDRUG / forensic validation literature as a legitimate method for identifying K2/Spice or buprenorphine.
4. Safariland's "flow chart" depicts **burgundy** as the amphetamine color and **blue** as methamphetamine/MDMA, misleading users into believing that burgundy is a reliable amphetamine positive when chemistry says otherwise.
5. Safariland has **not corrected** this flow chart or issued clarifying bulletins despite knowing BOP treats burgundy as a prison-discipline "positive" and keeps inmates in custody longer based on this error.

Safariland has powerful incentives:

- It holds multi-million-dollar contracts with BOP, DEA, CBP, DHS, and other agencies;
- Admitting that its kits are being misused, or that its interpretive materials are wrong, risks both those contracts and potential exposure in flood-gate litigation by inmates and arrestees.

In Michel, (*Michel v. United States* **Citation: No. 3:16-cv-00277-GPC-AGS, 2017 WL 4923337 (S.D. Cal. Oct. 31, 2017)** Safariland escaped liability in part by pointing to warnings that field tests are presumptive and that results must be confirmed by laboratory testing. But in the prison context BOP **does not** confirm; it uses the kits as **final adjudicative tests** under *Hill*. Safariland knows this. Continuing to sell tests into that environment, while doing nothing to correct BOP's misuse and even providing "methods" that have no chemical validity, is not neutrality; it is participation.

Safariland's counsel's immediate response to this Court's Order—calling Plaintiff within hours, and leaving a voicemail two days later threatening a motion to dismiss while asking for a settlement demand—reflects Safariland's understanding that Plaintiff's complaint has pierced the usual veil. Plaintiff's response was that "Safariland was deeply ingrained in this case and will continue to be," because this litigation is not about one bad batch; it is about **how Safariland's products are marketed, interpreted, and weaponized** against inmates who cannot demand a GC/MS confirmation.

The TRO's requested preservation order is critical precisely because the most probative evidence of Safariland's role will be:

- Training decks and flow charts provided to BOP;
- Email chains between Safariland account reps and BOP executives (including those copied on the SIS advisory) discussing how to use A/U/W to "identify" Suboxone and K2;
- Internal Safariland communications acknowledging false positives and discussing litigation exposure.

If Safariland and BOP are willing to mischaracterize reagent colors to courts, it is entirely reasonable to fear what they might do to vulnerable emails and ESI once a case like this survives the pleading stage.

---

## VII. LEGALITY AND SCOPE OF REQUESTED TRO RELIEF

### A. TRO standard and PLRA narrowness

Under Fed. R. Civ. P. 65 and *Winter v. NRDC*, Plaintiff must show:

1. Likelihood of success on the merits or serious questions going to the merits;
2. Likelihood of irreparable harm absent relief;
3. Balance of equities tipping in his favor; and
4. Public interest supporting relief.

Because this case challenges prison policies, the PLRA, 18 U.S.C. § 3626, also requires that any injunctive relief be:

- "Narrowly drawn";
- Extend "no further than necessary" to correct the violation; and
- Be the "least intrusive means necessary."

This Reply focuses the requested TRO relief on **evidence preservation and non-retaliation**, which are classic, narrow uses of equitable power that protect both Plaintiff's individual rights and the Court's institutional interest in maintaining the integrity of its proceedings.

### B. Why the requested TRO is proper and does not require a class action

Plaintiff has described the broader implications of BOP's practices and what full merits relief might ultimately entail (e.g., limits on using NIK tests as stand-alone "some evidence" for GCT loss; notice to affected inmates). Those systemic remedies can be addressed in future phases or separate proceedings and may implicate Rule 23 considerations.

The **TRO**, however, seeks relief that is:

- **Individualized** to this case and this Plaintiff; and
- **Necessary** to prevent irreparable harm to the evidentiary record and to Plaintiff's ability to litigate.

Specifically, Plaintiff's TRO request—as narrowed for consistency with the PLRA—is to:

1. **Preserve ESI and documents**

- o Order BOP, DOJ, Safariland, and their officers, agents, employees, successors, and contractors not to delete, overwrite, alter, or destroy any documents or ESI from 2015–present relating to:
  - NIK Test A, U, W usage on inmate mail;
  - The January 2017 SIS advisory and follow-on directives;
  - "One Team" communications between SIS and DHOs;
  - A/U/W sequences used to claim "positive for amphetamines" in Mahasin, Fuller, Plaintiff's case, and similar incidents;
  - Internal reactions to FOIA requests (including Plaintiff's FOIA that produced four blank pages); and
  - Communications between Safariland and BOP executives regarding detection of K2/Spice and buprenorphine.
  - o Require reasonable steps to preserve ESI even where individual employees have left, by preserving mailboxes and servers associated with their roles.
2. **Protect Plaintiff and cooperating witnesses**
   - o Enjoin Defendants from retaliating against Plaintiff, any current or former BOP inmate, or any current or former BOP or Safariland employee for providing information, declarations, or testimony in this case.

This does **not** transform the case into a de facto class action. Courts routinely enter preservation and protective orders in individual prisoner civil-rights suits where there is a plausible risk of spoliation and retaliation. The fact that some of the preserved materials may also bear on other prisoners' cases does not invalidate a narrowly drawn TRO that is necessary to protect this Plaintiff's claims.

Plaintiff has also articulated policy-level concerns: that BOP should no longer be allowed to:

- Treat unconfirmed NIK results—especially when colors are misread—as final proof of drug possession; or
- Continue to mislead courts about burgundy Test U results.

Those are important remedies. But recognizing PLRA constraints, Plaintiff is not asking this Court to impose system-wide prospective relief at the TRO stage. Instead, he seeks a TRO that **locks down the evidence** and **prevents retaliation**, so that the merits (including any broader injunction) can be litigated on a complete record.

## VIII. REQUESTED TRO TERMS (EVIDENCE PRESERVATION, ESI, AND PROTECTIVE ORDER)

Based on the foregoing, Plaintiff respectfully requests a TRO that provides, in substance:

1. **Evidence and ESI Preservation – BOP/DOJ**

The United States, the BOP, and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them are RESTRAINED AND ENJOINED from deleting, overwriting, altering, or destroying any documents, emails, text messages, electronic files, or physical evidence from January 1, 2015 to the present relating to:

- NIK Test A, U, and W usage on inmate mail or paper at any BOP facility;
- The January 2017 SIS advisory concerning A/U/K or A/U/W sequences, including all drafts, distribution lists, and follow-on guidance;
- Any "One Team" communications or directives between SIS, DHOs, and regional/national administrators regarding coordination of disciplinary outcomes;
- Plaintiff's incident report, DHO hearing, SIS investigation, and § 2241 litigation;
- The disciplinary incidents and NIK testing in **Mahasin v. Warden, USP Atwater** and **Fuller v. Rich**, and any other incident in which staff reported Test U turning burgundy and treated that as positive for amphetamines; and
- Responses to FOIA requests, including Plaintiff's FOIA (Ex. E), in which BOP redacted or withheld NIK-related guidance under law-enforcement exemptions.

This should expressly include preservation of:

- Email accounts and ESI for R. John Lynn, S. Aguilar, Lt. Johnson, Wade Jennings, Brad Trate, Kevin Schwinn, and any successors in those roles;
- Network shares used by SIS, Discipline Hearing Officers, and regional intelligence units.

2. **Evidence and ESI Preservation – Safariland**

Safariland LLC, its officers, agents, servants, employees, attorneys, account representatives, and trainers are RESTRAINED AND ENJOINED from deleting, overwriting, or altering any documents or ESI from January 1, 2010 to the present relating to:

- NIK Test A, U, and W chemistry, validation, and interpretive guidance;
- Flow charts, training materials, manuals, and emails provided to BOP, DEA, CBP, DHS, or other federal agencies regarding A/U/K or A/U/W sequences;
- Communications with BOP officials (including those copied on the 2017 SIS advisory) about detecting K2/Spice, Suboxone, or "designer drugs" using NIK kits;
- Internal Safariland discussions of false positives, field-test litigation (including Michel), and risk management concerning correctional-facility use.

3. **Non-Retaliation**

All Defendants, and those acting in concert with them, shall be RESTRAINED AND ENJOINED from:

- Retaliating against Plaintiff for filing and prosecuting this action;

- o  Retaliating against any current or former BOP inmate, or any current or former BOP/Safariland employee, who communicates with Plaintiff, his potential counsel, or the Court regarding NIK testing, SIS advisories, or the "One Team" directive.

4. **Duration and Further Proceedings**

The TRO shall be effective for 14 days, or as otherwise ordered, and the Court may set a prompt hearing on whether to convert these preservation and non-retaliation obligations into a preliminary injunction pending final judgment.

This relief is **narrowly drawn**: it does not tell BOP how to run its institutions generally, nor does it grant class-wide relief. It simply freezes the playing field and protects the integrity of the litigation.

---

## IX. CONCLUSION

Plaintiff has shown:

- **Ongoing, concrete harm**: loss of employment and family-court prejudice due to the continuing publication and use of a "drug trafficker" narrative built on a chemically impossible NIK "positive";
- **Fraud on the court**: BOP and AUSAs repeatedly telling federal judges that burgundy Test U results are "positive for amphetamines," contrary to basic sodium-nitroprusside chemistry and Safariland's own litigation posture;
- **An ongoing nationwide practice**: recent § 2241 decisions (Mahasin, Fuller) demonstrating that the A/U/W burgundy scheme continues today, with real inmates losing good-conduct time and being sent to SHU on the same fraudulent basis;
- **Safariland's involvement**: flow charts and guidance that invert burgundy and blue, combined with a business model that treats prisons as a special domain where unconfirmed field tests can function as final adjudications rather than presumptive tools;
- **Serious questions on the merits** of his FTCA, due process, and retaliation claims; and
- The **risk of spoliation and retaliation** if no preservation order is entered.

For these reasons, Plaintiff respectfully requests that the Court:

1. GRANT a Temporary Restraining Order in the form described in Section VIII above;
2. Set a schedule for further briefing and hearing on conversion of the TRO to a preliminary injunction; and
3. Grant such other and further relief as the Court deems just and proper.

Dated: 12/09/2025

Respectfully submitted,

**BILLY STEFFEY**
Plaintiff, in pro per

# DECLARATION OF BILLY STEFFEY

I, Billy Steffey, declare:

1. I am the Plaintiff in this action. I make this declaration based on my personal knowledge.
2. Within approximately four hours of the Court issuing its Order requiring Safariland and the BOP to respond to my TRO, I received a telephone call from attorney Sydney Schaffer, who stated that she represents Safariland.
3. Two days later, knowing I was preparing to travel internationally, Ms. Schaffer left me a voicemail stating that she intended to file a motion to dismiss Safariland from the case but was also open to discussing a possible settlement. I am aware of Evidence rule 408 and that any statements made are not indications of guilt or wrongdoing.
4. I responded by email that I was not going to provide a dollar amount at that time and that Safariland was "deeply ingrained in this case and will continue to be. Period."
5. I have suffered recent, concrete harm from the Code 111 disciplinary finding and the resulting federal records. I obtained a high-value position at a technology company. Approximately six months later, a coworker found my § 2241 habeas filings online, reported to HR that I was a "drug trafficker," and I was terminated. I have never been arrested or charged with any narcotics offense.
6. Approximately three months ago, my girlfriend's former partner submitted the government's § 2241 response in Sacramento Family Court and argued that I was a "drug trafficker" and unsafe to be around his children. The judge did not grant the requested order, but the use of those records caused me substantial distress.
7. While incarcerated, I personally observed that NIK Test U turned burgundy even when testing plain paper, a fact later confirmed by manufacturer materials indicating that only blue is indicative of a positive result for methamphetamine-type substances.
8. I submitted a Freedom of Information Act request to the BOP seeking internal guidance concerning NIK Test U and its color interpretation. In response, I received a letter stating that four pages of responsive material were being withheld under exemptions, and the attached pages were completely blank except for exemption codes (Exhibit E).
9. I am prepared to provide the voicemail from Ms. Schaffer and my email response to the Court for in camera review if requested and to authenticate the FOIA response and other exhibits identified in this Reply.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 12/09/2025 Tokyo, Japan

/S/

# EXHIBIT F

to

PLAINTIFF'S REPLY IN SUPPORT OF EMERGENCY MOTION FOR TRO AND PRELIMINARY INJUNCTION

**REASON MAGAZINE ARTICLE – "THE $2 DRUG TEST KEEPING INMATES IN SOLITARY"**

Exhibit F is a true and correct copy of the article titled "The $2 Drug Test Keeping Inmates in Solitary," published in **Reason** magazine in July 2021. The article:

- Identifies Plaintiff, Billy Steffey, by name in the opening sentence;
- Describes his placement in solitary confinement and loss of good time based on NIK test results; and
- Discusses the unreliability and confusion surrounding NIK field tests used in federal prisons, including Test U's tendency to turn burgundy even when nothing is present.

This exhibit is offered to corroborate Plaintiff's account, show the public significance of the issues, and demonstrate that concerns about NIK testing in BOP facilities have been recognized in national media.



**FREE MINDS AND FREE MARKETS**

PRISONS

# The $2 Drug Test Keeping Inmates in Solitary

*Reason* tried out the field test kits used to test for drugs in prison. They were unreliable and confusing.

C.J. CIARAMELLA | FROM THE JULY 2021 ISSUE



(Photo: Julian Dufort)

Billy Steffey is determined not to eat the shot.

Steffey is a former federal inmate, and a "shot" is federal prison slang for a disciplinary infraction—as in, "They gave him a shot." When you can't dodge it, a shot is, like a punch in the mouth, something you have to eat.

According to the federal Bureau of Prisons (BOP), Steffey conspired to smuggle drugs into prison in the form of a sheaf of legal papers laced with an illicit substance. The evidence against Steffey is a string of suspicious emails and two field tests, which you can buy off the internet for about $2 apiece, that came back "presumptive positive" for amphetamines.

Steffey is no longer incarcerated, but he is still trying to fight the BOP for stripping him of good behavior credits and throwing him in solitary confinement for five months based on what he says is an unverified test with a well-established track record of leading to wrongful arrests.

"It appears that the Bureau of Prisons regularly deprives prisoners of good conduct time credit, thereby lengthening their time in prison, based on a testing protocol known for its high rate of error, without even minimal procedures to ensure that the tests are conducted correctly and that questionable test results are subject to confirmation," Steffey's appeal to the 9th Circuit, filed last August, argued.

Incredulous readers may roll their eyes—prisons are full of both drugs and liars—but hundreds of botched cases across the country have raised serious concerns about law enforcement's reliance on these types of test kits. Forensic experts say the tests can't be relied on alone; they're not admissible evidence in court; and the manufacturers explicitly warn that all tests should be sent to crime labs to be verified. New York's prison system suspended the use of similar tests last summer because of such worries. Yet the federal Bureau of Prisons relies solely on such tests to put inmates in solitary confinement, take away good behavior credits that count toward early release, and strip them of visitation rights. Meanwhile, low evidence

standards make it just about impossible for federal inmates to challenge the results of these tests in court. Steffey and other formerly incarcerated people say inmates are being jammed up on bad evidence with virtually no avenue for recourse. The BOP did not respond to a request for comment for this story.

The issues with these tests have been known for decades and are easily verifiable. *Reason* bought two packs of field drug tests and got positive results for several common, legal substances. But Steffey says the current system gives correctional officers an easy way to gin up shots against inmates.

"They don't want to hear that, because it's one of their tools that they have in their toolbox to get rid of people without question," he says. "They give them a shot, they send it to [regional headquarters] and say, 'Hey, we got to transfer this guy to a higher-security prison.'"

## How the Tests Work, and Don't

These test kits—plastic baggies with small glass vials inside—use basic chemical reactions to produce colors indicating the presence of various compounds. The user puts a small amount of the suspect substance into the baggie, cracks the vials, gently shakes, and watches to see what color results.

The Bureau of Prisons uses drug field tests manufactured by Safariland. Several companies make similar kits, but they all rely on the same underlying chemical reactions.

Heather Harris is an assistant professor of forensic science at Arcadia University who trains future chemists to use these color tests. "Atoms can combine together in groups—we call them functional groups—and these color tests are simply looking for the presence of a particular group," Harris says. "When they find that group, they then proceed to go through a reaction that has a color as its product."

A police officer or prison guard who comes across a suspicious substance could use Safariland's NIK Test A, a general screening test that can turn a variety of colors, to see what the substance might be. If the clear liquid turns orange, then brown, the substance *might* be methamphetamines or amphetamines. The officer then moves on to NIK Test U, which either turns blue to indicate a presumptive positive result for methamphetamines, or burgundy. A burgundy result on Test U, in conjunction with the orange-brown result in Test A, is considered presumptive positive for amphetamines.

These tests alone aren't admissible evidence in almost any court in the U.S., but they are considered probable cause for a police officer to arrest someone. And in prison, a "positive" field test can be enough to get inmates thrown in solitary confinement and stripped of other privileges.

The advantages of such tests for law enforcement are that they're cheap, they're portable, and they don't require a chemistry degree to use. The disadvantage is that, as simple as the tests are, they're far from immune to user error. The vials can be broken in the wrong order, for example. Colors are subjective. And the compounds that the tests screen for aren't exclusive to the illegal drugs the tests are supposed to indicate.

"A methamphetamine test might be targeting a functional group that is present on methamphetamine," Harris says. "That functional group, however, is not specific to methamphetamine. It's common in the world, so there's a variety of substances—some of which we know, but some of which we don't know—that are going to possess this group and allow this color test to produce a color."

Harris says the over-the-counter cold medicine Benadryl can produce positive results in field tests for several types of illicit drugs. And the list of known substances that can trigger a positive result in these tests is ever-expanding. Last year in Georgia, a college football quarterback was arrested after bird poop on his car tested presumptive positive for cocaine.

*Reason* bought packs of both NIK Test A and NIK Test U to experiment with. They can be easily purchased online, and they're simple to use. Yet the results are up for interpretation.

A small piece of rosemary turned NIK Test A a light yellow-brown color, which could pass as a presumptive positive result if one really wanted it to. Coffee grounds also turned the solution in NIK Test A a dark brown, although it was unclear whether that was the result of a chemical reaction or just the color of the grounds themselves. Various types of paper seemed to have little effect on NIK Test A, though the solution turned the paper brown.

In addition, NIK Test U, the follow-up test for methamphetamines and amphetamines, turns burgundy when the ampule is cracked and shaken, regardless of whether anything is placed in the pouch. Steffey has put out a YouTube video demonstrating that a plain piece of paper will yield a burgundy result. This means that a presumptive positive for amphetamines in NIK Test A would be confirmed by NIK Test U by default.

This is not an error. Safariland's instructions note that "only after Test A goes from orange to brown AND Test U turns can you presumptively identify the substance of an amphetamine-type compound. Red in Test U alone does NOT indicate amphetamine-type compounds." The company did not return requests for comment for this story.

## Steffey's Story

In 2017, Steffey was serving a nine-year sentence at Federal Correctional Institution (FCI) Lompoc, a low-security federal prison in California, for his role in an online identity theft ring. He says it took him about four years to work his way down to that security level, and he was

three months away from a possible transfer to a minimum-security federal prison camp. Although they're not "Club Fed," as tabloid headlines like to joke, the camps are as good as it gets in the BOP system.

"It would have been a night-and-day difference," even coming from a low-security prison, Steffey says. "You get furloughs to go home and see your family. There's a lot more freedom."

Steffey says he got on the bad side of a couple of correctional officers, who began regularly searching his cell and generally making his life difficult.

In December of that year, a BOP mailroom staffer opened a package "of what appeared to be unfilled legal work" addressed to another inmate. The staffer noted that the papers felt "unusually thick" and gritty and looked discolored.

Contraband is a major problem for federal and state prison systems—especially synthetic marijuana, commonly called K2 or "spice," and suboxone, a synthetic opioid. Inmates have figured out novel ways of smuggling the drugs in, such as lacing paper with liquid K2. The paper is then cut up into small pieces and smoked.

They smoke it "and then they flip out," Steffey says. "They have seizures; get super high. They just do dumb shit. It's a big epidemic in prison."

To combat the flood of drugs, many state prisons have taken steps like banning physical mail and used book donations, which they claim are a major source of contraband. The BOP uses Safariland's NIK field kits to check for suspected drugs.

A BOP investigator tested the legal papers addressed to the inmate with NIK Test A, the general screening test, and noted that it "had an immediate orange rapidly turning brown color, indicating Amphetamines," according to court records. The investigator then tested another piece of the paper with NIK Test U, which "turned an immediate dark burgundy color, indicating Amphetamines."

The investigator linked the package to Steffey after finding an email sent to him that included the tracking number of the package. BOP investigators also discovered a chain of email messages that appeared to be thinly veiled code about money transactions and deliveries.

Steffey says he was in fact having federal court records sent to another inmate, sandwiched between some blank divorce forms downloaded off a court website. The BOP submitted pictures of the papers as exhibits in Steffey's lawsuit, but they are too low-resolution to read.

In prison, inmates often demand to see each other's paperwork to verify what they're in for and whether they've snitched. Prison has a strictly enforced social order, and sex criminals, especially those whose crimes involve children, are at the very bottom of it—shunned at best. So inmates sometimes run background checks on each other to make sure no one is lying. Getting another inmate's paperwork in the mail isn't allowed, but legal mail from an attorney

is supposed to be privileged. Steffey says a contact of his was using a real lawyer's name to send someone else's court records to another inmate. He insists it had nothing to do with drugs.

"From Day One, I denied it," Steffey says. "I was like, you guys are crazy. Let's see the test. I'll pay my own money to have it sent to a lab."

Instead, a BOP disciplinary hearing officer found Steffey guilty of introducing contraband narcotics into the prison. The officer threw him in the Special Housing Unit (SHU)—a sanitized term for solitary confinement—for five months, where he was held in a cell for at least 23 hours a day.

"That was really tough on me," Steffey says.

In 2011, a United Nations Special Rapporteur on torture concluded that solitary confinement beyond 15 days constituted cruel and inhumane punishment. But tens of thousands of incarcerated people in the U.S. are subjected to it for months, sometimes years, at a time.

The incident meant Steffey also lost any shot of going to a minimum-security camp. Instead, he was transferred to FCI Sheridan, a medium-security prison in Oregon. The BOP also stripped him of 41 days of "good time" credit for keeping a clean disciplinary record. There is no parole in the federal prison system, so accruing good time credit is one of the only ways that inmates can shave time off their sentences.

All of these steps were taken based on flawed physical evidence.

Safariland's NIK kits, as well as those produced by other companies, aren't supposed to be used on impure materials. Harris says the dyes and other chemicals in paper make it unreliable for color tests. "It's just not designed to work that way. Right off the bat, when you have a piece of paper and you pull out your field test kit, you've made the wrong decision," she says. "That's not going to give you a reliable result."

After he exhausted his appeals within the BOP bureaucracy—all denied—Steffey filed a petition for writ of habeas corpus in federal court in January 2019. He argued that the NIK tests were being improperly used and requested that his good time credits be restored.

While his case was dragging through court, though, Steffey got an unexpected reprieve. In July 2020, he was among the thousands of federal inmates granted compassionate release by federal judges because of the COVID-19 pandemic.

Photo: Julian Dufort

## Field Tests Under Fire

Roughly two months after Steffey's release, the New York Department of Corrections and Community Services (DOCCS) underlined:suddenly suspended use of drug field tests produced by another company, Sirchie.

"Effective immediately and until further notice, all SIRCHIE NARK II drug testing will be suspended and no misbehavior report will be issued, nor any adverse action taken against an incarcerated individual for suspected contraband drugs where a test is necessary," a leaked DOCCS memo obtained by *Gothamist* read.

The New York State Correctional Officers & Police Benevolent Association, a union of state correctional workers, told local news outlets that DOCCS found there were false-positive results with the testing kits being used to identify contraband drugs. "Inmates who were penalized for contraband drugs have been released from special housing units and their records were expunged," *The Auburn Citizen* reported last August.

A spokesperson for the DOCCS says the agency "is reviewing its current procedure for the testing of suspected contraband drugs. During this review, we have suspended testing. As part of the review, DOCCS is working with the Office of the Inspector General, and cannot comment further at this time."

The New York Offices of the Inspector General declined to comment on the investigation.

Prison advocates are calling for a similar suspension of the use of NARK II tests in Massachusetts prisons after more than a dozen attorneys said they were falsely accused of sending drugs to their incarcerated clients, who were then put in solitary confinement for receiving legitimate legal mail. Unlike in the federal prison system, Massachusetts prisons send all field tests to outside labs for confirmation. This at least captures the bogus results, although it still leaves inmates to suffer in solitary in the meantime.

"That's how [these tests] were integrated into forensic science in the first place, to be followed up with confirmatory tests," Harris says. "The prisons have really gone off on their own to use it as this kind of one and only definitive test for whatever punishment or other purposes they're using it for. They're doing this outside of what I would say is the generally accepted use in the community."

This is why Sirchie's webpage for the NARK II test specifically warns, "NOTE: ALL TEST RESULTS MUST BE CONFIRMED BY AN APPROVED ANALYTICAL LABORATORY! The results of this test are merely presumptive. NARK® only tests for the possible presence of certain chemical compounds. Reactions may occur with, and such compounds can be found in, both legal and illegal products."

Sirchie did not return requests for comment for this story.

## Cotton Candy, Baking Soda, and Other Narcotics

Although police departments must rely on crime labs to confirm or invalidate field tests, that doesn't stop innocent people from being arrested and jailed based on preliminary test kits.

In 2016, sheriff's deputies in Monroe County, Georgia, arrested Macon resident Dasha Fincher after a search of her car turned up a plastic baggie of blue crystals. A NARK II field test of the substance returned a presumptive positive for methamphetamines, and Fincher was charged with trafficking and possession of meth with intent to distribute.

Fincher's bail was placed at $1 million. She sat in jail for three months until a state crime lab determined that the -substance was exactly what Fincher had claimed it was when she was arrested: blue cotton candy. A follow-up investigation by a Georgia news station found that the NARK II test kit produced 145 false positives in Georgia in 2017.

Fincher sued the Monroe County Sheriff's Office and Sirchie, but a federal judge dismissed the suit in May 2020. The judge ruled that Fincher hadn't shown that Sirchie's product was defective or that the company had failed to warn law enforcement officers of the tests' shortfalls. And the judge ruled that because the deputies reasonably believed the tests they used were reliable, they had both sovereign and qualified immunity from Fincher's lawsuit.

Similar cases abound. In 2016, an Arkansas couple spent two months in jail after a sandwich bag of baking soda in their truck tested "positive" for cocaine. "We tested it three different times out of two different kits to make sure that we weren't having any issue, and each time

we got a positive for controlled substance," the Fort Chaffee police chief <u>told</u> a local news outlet.

A Florida man was wrongfully jailed in 2017 after a field test <u>confused his donut glaze with meth</u>. A 2018 drug seizure in North Carolina originally touted as "$2 million worth of 'the deadly opioid fentanyl'" <u>turned out to be white sugar</u>.

In 2019, *Reason* <u>obtained body camera footage</u> showing a former Florida sheriff's deputy arresting an innocent man after the deputy allegedly found methamphetamines in the man's car. The footage shows the officer performing a NARK II test for methamphetamines, which turned dark red instead of blue, indicating a negative result, according to the manufacturer. That deputy has since been indicted on more than 50 criminal charges related to framing innocent people.

Some defendants—facing an extended stay in jail and threats from prosecutors about the sentences they'll get if they turn down a deal—plead guilty to crimes they know they didn't commit. Presumptive positive drug tests give the prosecutors leverage with which to pressure defendants in this way.

A 2016 *ProPublica*/*New York Times* <u>investigation</u> found that 212 people pleaded guilty between January 2004 and June 2015 to drug possession based on Houston Police Department field tests that were later invalidated by crime labs.

## 'No Controlled Substance...Identified'

Outside of prison, those accused of drug possession based on a field test at least have some recourse to the criminal court system, where the high standards of evidence require presumptive positive field tests to be confirmed by crime labs. But inside, incarcerated people are at the mercy of bureaucracies even more strongly tilted against them.

Alberto Abarca, a former federal inmate, says he, like Steffey, was punished for drug contraband based on a bogus NIK test. In 2017, correctional officers at FCI Sheridan put Albarca and his cellmate, Carlos Vasquez-Maldonado, in the SHU and accused the two of possessing drugs in their cell. The guards had found an ink pen with a suspicious orange substance inside. NIK Tests A and U both came back "presumptive positive" for amphetamines.

Albarca says what the officers found was an empty Pilot G2 pen, and the suspicious substance was simply the stopper fluid that keeps the ink in gel pens from leaking or drying out. The fluid is typically grease or oil with other proprietary substances added to thicken it.

"I had been in the HVAC apprenticeship program for four years, and I was risking losing all that over this faulty NIK test kit," Abarca says. "My cellie, we said, 'Please, just send it to the lab. We'll pay for it.'"

Although the BOP requires all positive urinalysis screenings for drugs to be verified by forensic labs, it has no similar policy for contraband tests. Courts have ruled that inmates have no right to demand independent verification of drug tests.

According to documents filed by the BOP in a 2019 lawsuit by Vasquez-Maldonado challenging his punishment, a BOP officer tested a fresh ink cartridge to see if a false positive resulted, but it did not. Vasquez-Maldonado's lawsuit was dismissed.

Because the BOP does not require NIK tests for contraband to be independently verified, it's impossible to say how often it happens, but *Reason* found at least one case where a federal inmate was punished based on the results of a NIK test that was later invalidated by a crime lab.

Brett Blaisure was incarcerated at FCI Beaumont, a federal prison in Texas. Blaisure practiced Wicca, and as part of his observance he wore a leather pouch around his neck with sage, frankincense, salt, and myrrh inside it. On December 4, 2014, he says, a correctional officer confiscated his pouch and tested its contents for drugs.

The disciplinary report says that using NIK Test A, Blaisure's pouch "tested positive for Amphetamine." The report makes no mention of NIK Test U, which is supposed to follow Test A.

As a result of the infraction, Blaisure spent 30 days in the SHU. He also lost 41 days of good time credits and had visitations suspended for nearly six months.

After he got out of solitary, Blaisure says he convinced BOP staffers to send the alleged narcotics to a local crime lab to be tested. After waiting six or seven weeks, he asked about the results. Blaisure says a BOP official told him, "'Look, we're not going to go with the lab results. We're going to go with what happened in the office. We used NIK Test A, and it was positive, so don't come bother us. Don't come and ask us about it anymore. Your shot is staying the way it is."

After spending two years going through the Bureau of Prisons' grievance process and appealing his disciplinary sanctions, fruitlessly, Blaisure filed a petition in federal court in July 2016 seeking to restore his lost good time credits. (Federal inmates must exhaust their administrative appeals before they can file a lawsuit, and the exhaustion process often lives up to its name.)

When a federal judge ordered the BOP to respond to Blaisure's claims, the government lawyer preparing the response found the nearly two-year-old results of the Jefferson County Regional Crime Laboratory's test of the contents from Blaisure's pouch: "No controlled substance or dangerous drug identified," the lab had concluded.

"The whole time they had had a negative result from the lab saying that what I possessed was plant matter, period," Blaisure says. "They had this paperwork and knowledge that I wasn't allowed to possess for two years, and they made me suffer the consequences."

The BOP disciplinary hearing officer submitted a sworn affidavit that he was unaware of the test. The BOP then expunged the violation from Blaisure's record, making his lawsuit moot.

"I can't even count how many people I saw that happen to," Blaisure says of inmates being hit with bogus contraband accusations, "but I can guarantee you I'm one of the very few that I know of that took it all the way to federal court and won."

## 'All the Process Due Them'

Blaisure has reason to sound proud of beating the rap. Almost no one else ever does.

Courts give wide latitude to prisons to manage their daily affairs and security, and that extends to prison disciplinary hearings. In 1985, the U.S. Supreme Court ruled in *Superintendent v. Hill* that the BOP needs to show only "some evidence" to support a disciplinary sanction revoking an inmate's good time credits—a far lower bar than both the "beyond a reasonable doubt" standard that applies in criminal court and the "preponderance of evidence" standard used in civil cases.

"We hold that the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board," the Court wrote. "The relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board."

Lower federal courts, building on *Hill*'s precedent, have held that a single positive drug test is sufficient to support disciplinary action; that those tests do not have to have a 100 percent confidence factor; and that inmates have no due process right to have those tests verified by an outside lab.

In 1989, a 4th Circuit Court of Appeals panel rejected an inmate's argument that relying solely on unconfirmed positive results to impose sanctions violated the right to procedural due process. It ruled that the single field test afforded to many incarcerated people is "all the process due them under the Constitution and interpreting case law."

Roger Terry, an inmate in a Maryland state prison, filed a lawsuit in 2011 after he was put in solitary confinement for nearly 200 days following a positive NIK test of coffee grounds that was later invalidated by a crime lab. Such is the majesty of the law that a U.S. District Court judge dismissed his suit, ruling that he had suffered no deprivation of due process or cruel or unusual punishment.

Some state courts have been more skeptical. In 2018, the Superior Court of Imperial County, California, underline{ruled} in the case *People v. Chacon* that unverified NIK tests were not admissible evidence in grand jury proceedings.

The court held a lengthy evidentiary hearing, where it became clear that the local district attorney's office frequently used NIK test kits as evidence to obtain grand jury indictments, despite a number of innocent people having been indicted and clear warnings from Safariland that the tests should be verified.

"When confirmatory testing is done by the Department of Justice [in] some Grand Jury charged cases there turns out to be no controlled substances," the court noted.

The testimony in *Chacon* also established that the term "presumptive positive," as used by law enforcement and prosecutors, was largely meaningless, since the tests can't discriminate between illicit substances and the dozens of known licit substances that also trigger color reactions.

"One of the many examples of the NIK testing errors was a case where heroin was identified using a NIK colorimetric test and a second Valtrox colorimetric test," the court wrote in its ruling. "The substance was determined to be chocolate. So, if one were to accept the logic proffered by the People that the NIK heroin test is presumptive positive for heroin it would also be true that it is a presumptive positive test for chocolate. Likewise, if the NIK colorimetric test for methamphetamine is presumptive the same colorimetric test would be a presumptive test for 'Equal,' the sugar substitute. The NIK Color test for heroin does not meet any recognized forensic scientific standard."

Testifying in the case, Allison Baca, a criminalist at the California Department of Justice, said that the agency does not use the term "false positive" when talking about color tests, because they do not consider such tests to be either positive or negative. The kits are screening tests that help the user determine what a substance *might* be.

And this is the rub of Steffey's argument in his lawsuit. He isn't saying that NIK tests are producing false positives—that is, incorrectly indicating the presence of drugs. He's saying that the tests don't provide reliable positive or negative evidence in the first place and that untrained BOP staffers are misusing and misinterpreting the tests.

## Caught in a Bind

Unlike in Chacon, however, the federal district court that eventually heard Steffey's lawsuit underline{dismissed} his case in May 2020 and denied his motion to hold an evidentiary hearing on the reliability of NIK tests. Without that hearing or additional records from the BOP, Steffey and his public defender weren't able to put together a strong record to back up his appeal.

Federal inmates trying to fight NIK test determinations are caught in a bind: They have no procedural grounds to challenge their punishment as long as these tests are considered "some evidence," but none of them can get far enough in court to challenge the validity of that evidence, even though there is an ample record to support their claims—including from the government itself. As early as 1978, the U.S. Department of Justice published standards for using drug field tests that advised the tests "should not be used for evidential purposes."

Other law enforcement agencies have changed their policies over the last decade. In 2013, Travis County, Texas, stopped accepting guilty pleas for low-level drug possession before official crime lab results came in. The move followed the discovery of a dozen false positives linked to field tests. Harris County, Texas, and Portland, Oregon, did the same in 2016. The Houston Police Department discontinued the use of drug field tests in 2017.

As for Steffey, the grant of compassionate release that got him out of prison early also messed up his case, because the government was able to argue that he'd already received the relief he was seeking. He voluntarily dismissed his 9th Circuit appeal in December. But Steffey, still insistent on dodging the shot, says he plans on refiling the case as a civil rights lawsuit instead of a habeas petition.

The fact is, even if Steffey is lying about his own conduct, he's right about the unreliability of these field tests.

"It seems like it would be simple enough to prove my case, but no one will listen because no one gives a fuck about what happens to inmates," Steffey says. "But I promise you, it happens to people on the street too. I guarantee it." **r**

**C.J. CIARAMELLA** is a reporter at *Reason*.

PRISONS    DRUG TESTING    WAR ON DRUGS    COURT OF APPEALS    DUE PROCESS

# EXHIBIT E

to
PLAINTIFF'S REPLY IN SUPPORT OF EMERGENCY MOTION FOR TRO AND
PRELIMINARY INJUNCTION
**FOIA REQUEST AND REDACTED RESPONSE**

Exhibit E consists of:

1. Plaintiff's Freedom of Information Act (FOIA) request(s) to the Federal Bureau of
   Prisons seeking SIS advisories, NIK testing protocols, and related documents; and
2. The BOP's response, consisting of pages that are heavily or entirely redacted.

This exhibit is offered to show the Bureau of Prisons' resistance to disclosing its internal
directives regarding NIK testing and to underscore the need for a court-ordered preservation of
evidence.



U.S. Department of Justice

Federal Bureau of Prisons

Central Office
320 First St., NW
Washington, DC 20534
(202) 616-7750

Billy Steffey
Register Number: 68463-097
FCI Sheridan
P.C. Box 5000
Sheridan, OR 97378

Dear Billy Steffey:

The Federal Bureau of Prisons (BOP) received your Freedom of Information Act/Privacy Act (FOIA/PA) request. Your request has been assigned a number and forwarded to the processing office noted below. Please make a note of the request number and processing office as you will need to include it in any correspondence or inquiry regarding your request. A copy of the first page of your request is attached to help you more easily keep track of your request.

FOIA/PA Request Number:       2019-06228
Processing Office:            CO

The time needed to complete our processing of your request depends on the complexity of our records search and the volume and complexity of any records located. Each request is assigned to one of three tracks: simple, complex, or expedited. Due to the large number of FOIA/PA requests received by BOP and the limited resources available to process such requests, BOP handles each request on a first-in, first-out basis in relation to other requests in the same track. Your request was assigned to the complex track and placed in chronological order based on the date of receipt.

We determined unusual circumstances exist as the documents responsive to your request must be searched for and collected from a field office, and/or the documents responsive to your request are expected to be voluminous and will require significant time to review, and/or your request requires consultation with at least one other agency with a substantial interest in your request. Because of these unusual circumstances, we are extending the time limit to respond to your request for the ten additional days provided by the statute. Processing complex requests may take up to nine months. Pursuant to 28 C.F.R. § 16.5(b) and (c), you may narrow or modify your request in an effort to reduce the processing time.

Pursuant to 28 C.F.R. § 16.10, in certain circumstances we are required to charge fees for time spent searching for or duplicating responsive documents. If we anticipate your fees will be in excess of $25.00 or the amount you have indicated you are willing to pay, we will notify you of the estimated amount. At that time, you will have the option to



U.S. Department of Justice
Federal Bureau of Prisons

Central Office
320 First St., NW
Washington, DC 20534

September 27, 2019

Billy Steffey #68463-097
FCI Sheridan
P.O. Box 5000
Sheridan, OR 97378

Request Number: 2019-06228

Dear Mr. Steffey:

This is in response to the above referenced Freedom of Information Act (FOIA) request. A copy of your request is attached.

In response to your request, staff located 4 pages of responsive records, which were forwarded to this office for a release determination. After careful review, we determined the 4 pages must be withheld in their entirety.

Pursuant to the Freedom of Information Act, 5 U.S.C. § 552, records were redacted under the following exemption:
(b)(7)(E), Permits withholding of records when techniques and procedures for law enforcement investigations or process would be disclosed or provided such disclosure could reasonably be expected to risk circumvention of law.

If you have questions about this response please feel free to contact the undersigned, this office, or the Federal Bureau of Prisons' (BOP) FOIA Public Liaison, Mr. C. Darnell Stroble at 202-616-7750 or 320 First Street NW, Suite 936, Washington DC 20534.

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you are not satisfied with my response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Sixth Floor, 441 G Street, NW, Washington, DC 20001. Your appeal must be postmarked within 90 days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

S. Arellano, for
Eugene E. Baime, Supervisory Attorney

TRULINCS 68463097 - STEFFEY, BILLY - Unit: SHE-A-R

--------------------------------------------------------------------------

FROM: 68463097
TO:
SUBJECT: Freedom of Information Request
DATE: 08/29/2019 02:53:58 PM

>

August 28, 2019

Billy Steffey 68463097
FCI - Sheridan
PO Box 5000
Sheridan, OR 97378

**Received**

SEP 0 6 2019

FOIA/PA Section
Federal Bureau of Prisons

Re: FOIA for ALL instructions and flowcharts from Safariland regarding testing procedures for NIK Test

Dear FOIA Compliance Officer,

Per the Freedom of Information Act, I am requesting copies of all instructions and Flowcharts and recent bulletins that has been sent to BOP staff from Safariland LLC, makers of the NIK Testing Kit. I am looking specifically for the bulletins pertaining to the testing of Buphenepherine (Suboxone) as well as K2 and Spice.

I am aware that BOP maintains a vendor contract with Safariland and they receive regular testing updates for substances. I have personally read some of these internal, GroupWise emails from the Western Region (CSS) and SIA agent that was sent out to all of the regional SIS. I want BOP's instructions and processes that they are advised to follow when testing unknown substances that have appeared on the scene AFTER the NIK test was developed. These include Buphenepherine (Suboxone) and Spice and K2. I would also like a copy of all testing instructions for the NIK Kit, not just the Identidrug Chart.

I'd also like copies of records where BOP staff notified Safariland of the "false positives" when using Test U and how literally anything will result in a burgundy test, which BOP mistakenly identifies as a positive test for amphetamines.

It is my belief that BOP has been intentionally misrepresenting Test U to be a positive test for amphetamines when in fact Test U cannot detect amphetamines, only methamphetamines and MDMA. Only a BLUE color is indicative of a positive result. This has gone on for years and hundreds if not thousands of inmates have been wrongly sanctioned at discipline hearings based on this test.

Respectfully,

cc: office of information policy
    office of inspector general



Page 1

Withheld pursuant to exemption

(b)(7)(E)

of the Freedom of Information and Privacy Act





Page 3

Withheld pursuant to exemption

(b)(7)(E)

of the Freedom of Information and Privacy Act



Page 4

Withheld pursuant to exemption

(b)(7)(E)

of the Freedom of Information and Privacy Act

BP-A0288
JAN 17

**INCIDENT REPORT**

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

**Part I – Incident Report**

| 1. Institution:  FCI Herlong | | Incident Report Number: 3025931 | |
|---|---|---|---|
| 2. Inmate's Name: Clark Bailey | 3. Register Number: 64110-065 | 4. Date of Incident: August 24, 2017 | 5. Time: 3:00p.m. |
| 6. Place of Incident: Tahoe Delta, Cell 111 | 7. Assignment: Yard PME | | 8. Unit: Tahoe Delta |
| 9. Incident: Introduction or making of any drugs or alcohol | Possession of any drugs or alcohol | 10. Prohibited Act Code(s) 111 | 113 |

11. Description of Incident (Date: 08/24/2017   Time: 3:00 p.m. Staff became aware of incident):

After the completion of an SIS investigation it is determined that; On August 24, 2017, at approximately 3:00pm, staff conducted a random cell search of Tahoe Delta, cell 111, at the time assigned to inmates Clark Bailey, Reg. No. 64110-065 and Travis Donovan, Reg. No. 46939-048. While conducting the search staff located what appeared to be hand written instructions of which website to visit for the purpose of purchasing K-2 spice, a form of synthetic cannabis; furthermore, how to properly saturate greeting cards using a liquid form of K-2 spice and introduce them to Correctional Facilities through the mail room using the U.S Postal Service (USPS). The hand written instructions were located in the common area of the cell, placed on the ground next to the inmate assigned lockers concealed inside a box of laundry soap which was under some clothing items baring inmate Bailey's identifying information. While inventorying the property located inside inmate Bailey's assigned secure inmate locker, staff located three (3), one (1) half greeting cards which appeared to have been saturated in an unknown substance causing them to be malleable and on one card which had a hand written message for the ink to become bleary and for said ink to bleed through the greeting card. The three (3) half cards were tested by SIS for the presence of a foreign substance utilizing the NIK testing procedures outlined in an SIS ADVISORY dated March 27, 2017. Testing procedures produced a positive results for Methamphetamine Reagent which indicates the presence of Amphetamine by results turning burgundy in color. It is concluded that the instructions found in the common area of cell 111, were utilized to introduce narcotics to FCI Herlong, some of which were located inside inmate Bailey's inmate assigned secure locker, at which the time it was under his (Bailey's) dominion.

\*\*\*This incident report was re-written pending the completion of an SIS investigation.\*\*\*

| 12. Typed Name/Signature of Reporting Employee: A. Potichkin / | 13. Date And Time: September 20, 2017 / 6:50a.m. |
|---|---|
| 14. Incident Report Delivered to Above Inmate By (Type Name/Signature):  J. Rodgers / | 15. Date Incident Report Delivered: 9.20-17 | 16. Time Incident Report Delivered: 9:20am |

**Part II – Committee Action**

17. Comments of Inmate to Committee Regarding Above Incident:

Inmate declined to make A statement at this time.

| 18. A. It is the finding of the committee that you: ___ Committed the Prohibited Act as charged. ___ Did not Commit a Prohibited Act. ___ Committed Prohibited Act Code(s). ___  ___ | B. X The Committee is referring the Charge(s) to the DHO for further Hearing. C. X The Committee advised the inmate of its finding and of the right to file an appeal within 20 calendar days. |
|---|---|

19. Committee Decision is Based on Specific Evidence as Follows:

Referred to the DHO based on severity of charge.

20. Committee action and/or recommendation if referred to DHO (Contingent upon DHO finding inmate committed prohibited act):

GCT, DS, LP comm, Phone, E-mail

21. Date and Time of Action: 9-20-17 12:xp (The UDC Chairman's signature certifies who sat on the UDC and that the completed report accurately reflects the UDC proceedings).

M. Dixon /

| Chairman (Typed Name/Signature) | Member (Typed Name) | Member (Typed Name) |
|---|---|---|

# EXHIBIT G

to

PLAINTIFF'S REPLY IN SUPPORT OF EMERGENCY MOTION FOR TRO AND PRELIMINARY INJUNCTION

**REPRESENTATIVE 2024–2025 § 2241 DECISIONS INVOLVING BURGUNDY TEST U RESULTS**

Exhibit G consists of cover pages and key excerpts from representative federal habeas corpus decisions decided in 2024–2025, including:

1. **Fuller v. Rich**, No. 5:24-HC-02100-M-RJ (E.D.N.C. Jan. 27, 2025) – portions of the Incident Report and court decision describing NIK Test U turning "burgundy" and Test W turning "olive," which BOP and the court treated as a positive result for amphetamines; and
2. **Kachina v. Gutierrez**, No. CV-23-00531-TUC-RM, 2024 WL 3778208 (D. Ariz. July 25, 2024) – portions of the memorandum and decision describing NIK Test U developing an "immediate burgundy" color and Test W turning "yellow," which, under the Identidrug chart, were treated as a "verified positive" for amphetamines.

These excerpts are offered not to challenge those judgments here, but to demonstrate that:

- BOP is still, as recently as 2024 and 2025, characterizing **burgundy Test U results** as "positive for amphetamines";
- Courts around the country are accepting those mischaracterizations and denying § 2241 relief based on them; and
- The fraudulent testing and misrepresentation practices at issue in this case are part of an ongoing nationwide pattern.